UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    No. 17-cr-51 (ADM/LIB) (1)

          Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Gary Richard Auginash, Jr (1),

          Defendant.


UNITED STATES OF AMERICA,                    No. 17-cr-51 (ADM/LIB) (2)

          Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Stanley Richard Cook (2),

          Defendant.

      This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Gary Richard Auginash's ("Defendant Auginash") Motion to Suppress Statements, [Docket No. 43]; Defendant Auginash's Motion to Dismiss for Prosecutorial Delay, [Docket No. 44]; Defendant Stanley Richard Cook's ("Defendant Cook") Motion to Suppress Statements, [Docket No. 34]; and Defendant Cook's Motion to Dismiss Indictment Due to Pre-Indictment Delay. [Docket No. 35]. The Court held a motions hearing on May 1, 2017, regarding the parties' pretrial motions.[1] The parties requested an opportunity to

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Orders. [Docket Nos. 55, 56].

submit supplemental briefing which was completed on May 17, 2017, and the motions were then taken under advisement at that time.

In his Memorandum in Support of his Motion to Dismiss for Prosecutorial Delay, Defendant Auginash withdrew his Motion to Suppress Statements, [Docket No. 43], based on the testimony presented at the motions hearing. (Def. Auginash's Mem., [Docket No. 61], at 21). Accordingly, Defendant Auginash's Motion to Suppress Statements, [Docket No. 43], is withdrawn, and it is deemed moot. Accordingly, the Clerk's Office is directed to term Defendant Auginash's Motion to Suppress Statements. [Docket No. 43].

For the reasons discussed below, the Court recommends that Defendant Auginash's Motion to Dismiss for Prosecutorial Delay, [Docket No. 44], be **DENIED**; Defendant Cook's Motion to Suppress Statements, [Docket No. 34], be **GRANTED**; and Defendant Cook's Motion to Dismiss Indictment Due to Pre-Indictment Delay, [Docket No. 35], be **DENIED**.

## I.     BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant Auginash and Defendant Cook (collectively "Defendants") are each charged with one (1) count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 2, 113(a)(3), 1151, and 1153(a), and one (1) count of discharge of a firearm during the commissions of a crime of violence in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(iii), 113(a)(3), 1151, and 1153(a). (Indictment [Docket No. 1]).

### B.  Facts[2]

Around midnight on June 21, 2014, Sergeant Harlan Johnson ("Sgt. Johnson") received an emergency call from a female caller reporting that persons in a vehicle had shot at her house.

---

[2] These facts are derived from the testimony of Red Lake Police Officer Sergeant Harlan Johnson at the May 1, 2017, motions hearing.

(May 1, 2017, Motions Hearing, Digital Recording at 1:49–1:50 p.m.). The caller also gave a description of the vehicle out of which the house had been shot at, gave the license plate number of the vehicle, and the location of the shooting. (Id. at 1:49–1:51 p.m.). The shooting occurred in an area known alternatively as Circle Pines or Hooterville. (Id. at 1:49–1:51 p.m.). The vehicle was described as a maroon SUV, a Red Lake license plate number was given, and the name Auginash Jr. or Jr. Auginash was provided as well. (Id. at 1:49–1:53 p.m., 2:21–2:23 p.m.).

After receiving the information from the caller about the shooting, Sgt. Johnson began driving westbound on Highway 1 toward the location. (Id. at 1:49–1:52 p.m.). In route to the location of the reported shooting, Sgt. Johnson met a vehicle matching the description and license plate number he had been given driving east bound on Highway 1 away from the shooting location. (Id. at 1:49–1:53 p.m.). Upon meeting the vehicle, Sgt. Johnson completed a U-turn, engaged his emergency lights, and began pursuit for the purpose of initiating a traffic stop. (Id. at 1:50–1:52 p.m.). In the short time Sgt. Johnson was driving behind the SUV, he observed it swerve and cross the fog line. (Id. at 1:51–1:52 p.m.). Sgt. Johnson testified that, at the time of the traffic stop, he was concerned for officer safety because of the previously reported shooting from the car indicating that there was possibly a firearm in the vehicle. (Id. at 1:51–1:52 p.m.). Sgt. Johnson pulled directly behind the SUV, and Officer Bialke, in a separate vehicle, subsequently pulled up in line behind Sgt. Johnson. (Id. at 1:51–1:53 p.m.).

Sgt. Johnson and Officer Bialke exited their vehicles with their sidearms drawn and held in the low and ready positions. (Id. at 1:53–1:55 p.m., 2:05–2:06 p.m., 2:13–2:14 p.m.). Sgt. Johnson began giving voice commands over his vehicle's PA system instructing the driver of the SUV to shut off the vehicle, throw the keys out of the vehicle, exit the vehicle, and walk backwards towards Sgt. Johnson with his hands in the air. (Id. at 1:53–1:55 p.m.). The driver

3

complied, and was later identified as Defendant Auginash. Sgt. Johnson testified that Defendant Auginash smelled of alcohol, slurred his speech, staggered when walking, and swayed when he paused his steps. (Id. at 1:53–1:55 p.m., 2:07–2:08 p.m.). When Defendant Auginash reached Sgt. Johnson, he patted down Defendant Auginash for weapons, found no weapons on Defendant Auginash's person, advised Defendant Auginash of the call Sgt. Johnson had received, and asked him if anyone else was in the vehicle. (Id. at 1:54–1:56 p.m.). Defendant Auginash advised Sgt. Johnson that there was another male individual still in the vehicle. (Id. at 1:54–1:56 p.m.). Sgt. Johnson then placed Defendant Auginash in the back seat of a patrol car without handcuffing him. (Id. at 1:54–1:56 p.m.).

Sgt. Johnson then began giving voice commands to the passenger in the vehicle. The passenger, later identified as Defendant Cook, exited the vehicle. (Id. at 1:56–1:57 p.m.). Sgt. Johnson testified that when Defendant Cook exited the vehicle he appeared much more intoxicated than Defendant Auginash, and Defendant Cook had to brace himself against the vehicle. (Id. at 1:56–1:57 p.m.). Sgt. Johnson—to ensure that Defendant Cook did not have a firearm—instructed Defendant Cook to turn and lift his shirt. (Id. at 1:57–1:58 p.m.). Defendant Cook complied, but he had to continue to brace himself against the SUV when he turned to face the officers in an effort not to fall. (Id. at 1:57–1:58 p.m.). Sgt. Johnson then instructed Defendant Cook to walk towards the officers while facing them. (Id. at 1:57–1:58 p.m.). Sgt. Johnson testified that he had Defendant Cook walk forward facing the officers, rather than backwards, because he appeared more intoxicated than Defendant Auginash, was moving around "a lot," was "staggering severely" even while using the SUV to brace himself, and he was essentially "falling down." (Id. at 1:57–1:58 p.m., 2:15–2:18). Although Defendant Cook was using the SUV to brace himself and walking forward, Sgt. Johnson testified that Defendant Cook

was not brought all the way back to the patrol car, but instead, Defendant Cook was instructed to get on the ground because Sgt. Johnson did not want Defendant Cook to fall and hurt himself. (Id. at 1:57–1:58 p.m.).

Officers then approached Defendant Cook, noted a very strong odor of alcohol, had to assist him to a seated position, and they then asked him if there was anyone else in the vehicle. (Id. at 1:57–1:59 p.m.). Defendant Cook responded that there was no one else left in the vehicle. (Id.). The officers then needed to help Defendant Cook to his feet at which time Defendant Cook stated that he just wanted to go home. (Id. at 1:57–1:59 p.m.). Sgt. Johnson then read Defendant Cook his Miranda rights, and he informed Defendant Cook that he was being arrested for public nuisance. (Id. at 1:58–2:00 p.m.). Sgt. Johnson asked Defendant Cook if he understood his rights, and Defendant Cook responded "yeah." (Id. at 1:58–2:00 p.m.). Sgt. Johnson told Defendant Cook that it was his chance to be honest with the officers, and Defendant Cook responded by asking again what he was being charged with. (Id. at 1:18–2:20 p.m.). Sgt. Johnson testified that Defendant Cook's language was "severely slurred," but Sgt. Johnson could understand it. (Id. at 1:58–2:00 p.m., 2:16–2:18).

Sgt. Johnson referenced the call about a shooting he had received earlier in the night, and he asked Defendant Cook who was shooting at the house. (Id. at 2:19–2:20 p.m.). Defendant Cook responded that "we both were." (Id.).  Defendant Cook was then placed into the back of a different patrol unit separate from the one holding Defendant Auginash. (Id.).

Sgt. Johnson then removed Defendant Auginash from the other patrol unit to conduct a field sobriety test. (Id. at 2:01–2:02 p.m.). Defendant Auginash failed each sobriety test administered including blowing a 0.176 on the preliminary breath test. (Id. at 2:09–2:13 p.m.). Having determined that Defendant Auginash would be arrested, Sgt. Johnson read Defendant

Auginash his <u>Miranda</u> rights and asked if he understood those rights. (<u>Id.</u> at 2:01–2:03 p.m.). Defendant Auginash acknowledged that he understood his rights, but he declined to speak with Sgt. Johnson. (<u>Id.</u>). Sgt. Johnson then returned Defendant Auginash to the back of the patrol car.

Sgt. Johnson then cleared the SUV to ensure that no one else in fact remained in the vehicle, and in doing so, he was able to observe a shotgun, 12-gauge shell casings, and an open Bud Light case containing some unopen Bud Light beer cans. (<u>Id.</u> at 2:03–2:04 p.m., 2:08–2:09 p.m.).

Sgt. Johnson then went to the location of the previously reported shooting. (<u>Id.</u> at 2:19–2:21 p.m.). At the residence where the shooting took place, Sgt. Johnson recovered some wadding which he placed in Ziploc bags that were provided to him by the occupants of the residence. (<u>Id.</u>). Sgt. Johnson also recovered "metal particles" from the scene of the reported shooting. (<u>Id.</u> at 2:24–2:26 p.m.).

## II.    DEFENDANTS' MOTIONS TO DISMISS. [DOCKET NOS. 35, 44].

Defendants both move the Court for an order dismissing the Indictment, [Docket No. 1], in the present matter due to the pre-indictment delay in the present case which Defendants argue violated their Fifth Amendment right to due process. (Defs.' Mot. to Dismiss [Docket Nos. 35, 44]). Defendant Auginash also argues that the alleged post-arrest delay in the prosecution of the present case violated his Sixth Amendment speedy trial rights. (Def. Mem., [Docket No. 65], at 16–21).

### A.  Pre-Indictment Delay

The Court first addresses the Defendants assertion that the pre-indictment delay in the present case violated their Fifth Amendment right to due process.

## 1. Standard of Review

"While [s]tatutes of limitation provide the primary guarantee against prosecution of a defendant on overly stale charges, the due process clause does have a limited role to play in protecting against oppressive delay." United States v. Brockman, 183 F.3d 891, 895 (8th Cir. 1999) (internal quotations omitted), cert denied, 528 U.S. 1080 (2000) (quoting United States v. Bartlett, 794 F.2d 1284, 1289 (8th Cir. 1986). "To establish unreasonable pre-indictment delay, a defendant must show that the delay resulted in actual and substantial prejudice to his defense, and that the government intentionally delayed the indictment to gain a tactical advantage or to harass him." United States v. Sprouts, 282 F.3d 1037, 1041 (8th Cir. 2002) (citing United States v. Sturdy, 207 F.3d 448, 452 (8th Cir. 2000)); see, United States v. Benshop, 138 F.3d 1229, 1232 (8th Cir. 1998).

> To prove actual prejudice, a defendant must specifically identify witnesses or documents lost during delay properly attributable to the government. Speculative or conclusory claims alleging "possible" prejudice as a result of the passage of time are insufficient. The defendant also must relate the substance of the testimony which would be offered by the missing witness or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defenses. Finally, the defendant must show that the missing testimony or information is not available through substitute sources.

Bartlett, 794 F.2d at 1289–90 (citations omitted). Accordingly, generically "[a]lleged prejudice is insufficient to establish a due process violation if it is insubstantial, speculative, or premature." United States v. Skinner, 433 F.3d 613, 617 (8th Cir. 2006) (internal quotations omitted) (quoting United States v. Grap, 368 F.3d 824, 829 (8th Cir. 2004)); see, United States v. Gladney, 474 F.3d 1027, 1031 (8th Cir. 2007). "Substantial prejudice cannot be established with the mere 'possibility of prejudice inherent in any extended delay: that memories will dim, witnesses will become inaccessible, and evidence will be lost.'" United States v. Johnson, 28

F.3d 1487, 1493 (8th Cir. 1994) (quoting United States v. Marion, 404 U.S. 307, 326 (1971)).

"The defendant carries the burden to show the lost testimony or information is not available

through other means." Gladney, 474 F.3d at 1031 (citing Sturdy, 207 F.3d at 452); Sprouts, 282

F.3d at 1041. "As a result, a defendant must overcome a high hurdle when contending that a pre-

indictment delay that does not violate the statute of limitations is violative of the due process

clause." United States v. Jackson, 446 F.3d 847, 849 (8th Cir. 2006).

"The court will inquire into the reasons for delay **only** where actual prejudice has [first]

been established." Gladney, 474 F.3d at 1031 (emphasis in original); Skinner, 433 F.3d at 617;

Sprouts, 282 F.3d at 1041.

### 2. Analysis

Defendants argue that they have suffered actual and substantial prejudice because the

shotgun recovered from the Defendants' vehicle the night of the incident has already been

returned to its owner resulting in an inability by Defendants to conduct any forensic examination

of the shotgun; because certain other physical evidence can no longer be found again resulting in

the inability to forensically test the evidence; and because the passage of time has degraded the

witnesses' memories of the incident underlying the present Indictment which prejudices the

Defendants' abilities to reconcile alleged discrepancies and omissions in witness statements.

(Defs.' Mems. [Docket Nos. 60, 61]).

The Government argues that the Defendants have failed to demonstrate any actual or

substantial prejudice. (Gov't's Response [Docket No. 65]).

The Court first considers Defendants argument that they have suffered prejudice due to

the fact the firearm allegedly used in the incident underlying the present case has been returned

to its owner resulting in an inability "to test that firearm for fingerprints and other exculpatory

forensic evidence." (Def. Auginash Mem., [Docket No. 31], at 6). Defendants do not describe the specific evidence they believe forensic testing would have uncovered beyond general speculation that such testing might produce exculpatory evidence.

Essentially, Defendants argue that because the firearm was returned to its owner without testing by Defendants first being completed they are without the opportunity to conduct testing on the firearm which might have produced some unknown exculpatory evidence. (See, Id.). The Court concludes, however, that this generalized allegation of prejudice falls short of the "high hurdle" of actual prejudice required in the context of pre-indictment delays. The loss of opportunity to examine or test a firearm does not alone demonstrate actual prejudice. See, Bartlett, 794 F.2d at 1290 ("The defendant . . . must relate the substance of the testimony which would be offered by the missing witness or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense."). Regarding the possible forensic testing of the firearm in the present case, Defendants have not provided the Court with "sufficient detail to permit" it "to assess accurately whether the information is material to the" Defendants' defense. While Defendants speculate that exculpatory evidence might have been found upon examination of the firearm, they have not provided the court with any information to suggest it is likely or even probable that the examination would offer any exculpatory evidence nor have they specifically stated what type of exculpatory evidence they think the forensic examination would have shown. See, United States v. Manning, 56 F.3d 1188, 1194 (9th Cir. 1995) (concluding that defendant failed to establish actual prejudice despite defendant's allegations that "he lost access to his credit card records, which could have explained his location at the time of the killing" because the defendant did not "specifically state what the credit card records would show"); see also, United States v.

DeGeorge, 380 F.3d 1203, 1211-12 (9th Cir. 2004) (finding no due process violation despite six year delay and loss of evidence); United States v. Benson, 846 F.2d 1338, 1341 (11th Cir. 1988) (finding no due process violation despite eight year delay, loss of evidence, and death of a witness); United States v. Jakisa, No. 14-cr-119 (SRN/SER), 2015 WL 1810259, at *7–13 (D. Minn. Apr. 31, 2015) (finding no due process violation despite a delay of over twenty years, the loss of witness testimony, and the loss of the firearm believed to be used in the murder of the victim).

Defendants have, therefore, failed to demonstrate actual and substantial prejudice based on the return of the shotgun to its owner.

Defendants also argue that prejudice has been demonstrated because certain other physical evidence—such as the metal fragments found at the scene of the reported shooting and a box of unused shotgun shells recovered from the SUV the Defendants were driving—can no longer be found.[3] Defendants again assert generally that this other physical evidence could have been forensically tested and compared to reveal other possible exculpatory evidence and corroborate certain Defendant statements. Defendant Auginash speculates that the metal fragments found at the scene of the reported shooting incident could have been compared to the alleged unused shotgun shells recovered from the vehicle, and he argues that other shell wadding which possibly could have been found along the road or at the firing range[4] could have been compared to the waddings found at the scene of the incident underlying the present Indictment.

---

[3] Although Defendant argues that there was a "box of unused shotgun shells recovered from the vehicle" which can no longer be accounted for, there is no indication in the record before this Court (other than the assertion in Defendant Auginash's memorandum) that a box of unused shotgun shells was recovered from Defendants' SUV. Sgt. Johnson testified that he observed a case of Bud Light, a shotgun, and 12-guage casings in the vehicle. (May 1, 2017, Motions Hearing, Digital Recording at 2:03–2:04 p.m.).

[4] While it is unclear from his argument, it appears that Defendant Auginash is speculating that officers could have recovered other hypothetical shell waddings from a separate part of the road and a firing range where he was firing the shotgun and compared those hypothetical waddings to the two waddings found at the location of the reported shooting incident. (See, Def. Auginash's Mem., [Docket No. 61], at 9–10).

Defendant Auginash speculates that these forensic comparisons could have corroborated certain statements and produced exculpatory results without identifying or describing what statements or what exculpatory results specifically.

Like the unavailability of the shotgun discussed above, the Court concludes that these allegations of prejudice also fall well short of the "high hurdle" of actual prejudice required in the context of pre-indictment delays. The loss of opportunity to examine, compare, or test the above described physical evidence does not alone demonstrate actual prejudice. See, Bartlett, 794 F.2d at 1290 ("The defendant . . . must relate the substance of the testimony which would be offered by the missing witness or the information contained in lost documents in sufficient detail to permit a court to assess accurately whether the information is material to the accused's defense."); United States v. Jakisa, 2015 WL 1810259, at *7–13. Regarding the possible comparison and forensic testing of the missing metal fragments and unused ammunition, as well as, the comparison of hypothetical shell waddings to the recovered shell waddings in the present case, Defendants have not provided the Court with "sufficient detail to permit" it "to assess accurately whether the information is material to the" Defendants' defense. While Defendant Auginash speculates that exculpatory evidence might have been found upon examination of the missing metal fragments and unused ammunition, and further speculates that the examination may corroborate certain Defendant statements, he has not provided the Court with any information to suggest it is likely or even probable that the examination would offer any exculpatory evidence nor has he specifically stated what the forensic examination would show beyond the conjecture of possible exculpatory evidence. See, Manning, 56 F.3d at 1194 (concluding that defendant failed to establish actual prejudice despite defendant's allegations that "he lost access to his credit card records, which could have explained his location at the time of

the killing" because the defendant did not "specifically state what the credit card records would show"); see also, DeGeorge, 380 F.3d at 1211–12 (finding no due process violation despite six year delay and loss of evidence); Benson, 846 F.2d at 1341 (finding no due process violation despite eight year delay, loss of evidence, and death of a witness); Jakisa, 2015 WL 1810259, at *7–13 (finding no due process violation despite a delay of over twenty years, the loss of witness testimony, and the loss of the firearm believed to be used in the murder of the victim).

Defendants have, therefore, failed to demonstrate actual and substantial prejudice based on the loss of the metal fragments or the inability to collect hypothetical shell waddings.

Lastly, Defendants argue that the passage of time (about three years) has degraded the witnesses' memories of the incident underlying the present Indictment thereby prejudicing their ability to prepare a defense. Defendant Auginash points to certain witness statements which he alleges are inconsistent with one another and argues that due to the passage of time he can no longer reconcile these inconsistences as the witnesses' memories of the incident have been "sullied," "tarnished," and "tainted by the lapse of nearly three years." (Def. Auginash Mem., [Docket No. 31], at 7). Defendant Auginash also argues that the lack of any prior written statement from one Justin Smith (who was allegedly at the scene of the incident) prejudices his defense because he allegedly indicated he did not hear any shot fired, but Smith's memory will now be tainted after the passage of three years. (Id. at 8).[5]

Defendant Auginash's assertion of prejudice related to any loss of testimony due to the alleged erosion of time is highly speculative. The speculative nature of Defendant Auginash's claim is highlighted by the lack of evidence as to what the referenced witnessed now remember

---

[5] Defendants Auginash generally asserts that Mr. Smith made a statement at some point in time but that the statement was not included in discovery by the Government. (Id. at 8). If the statement was not included in discovery, it is unclear whether the statement was acquired, if such a statement was ever memorialized, and if it was memorialized, how it was lost.

or any evidence demonstrating what their testimony would now be. Regarding Mr. Smith, Defendant Auginash only provides conjecture as to what Mr. Smith's statement was at the time of the incident, and provides no evidence as to what Mr. Smith's testimony would be now. Defendants have failed to relate in any specific manner "the substance of the testimony which would be offered" by the witnesses. Bartlett, 794 F.2d at 1290. Accordingly, the Court cannot determine the materiality of any such testimony to Defendants' defense. See, Id.

Defendants have, therefore, failed to demonstrate actual and substantial prejudice based on the diminishment of the memories of witnesses due to the passage of time. See, Id.; United States v. Gladney, 474 F.3d 1027, 1032–33 (8th Cir. 2007) (finding that witnesses' alleged inability to remember events four years prior was speculative and conclusory and did not constitute due process violation especially where no evidence had been presented to demonstrate what the witness would have remembered at the time of the incident); see also, United States v. Purham, 725 F.2d 450, 453 (8th Cir. 1984) (concluding that the defendant had not demonstrated actual prejudice when he "relied solely on the admittedly real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence [will] be lost" because "these possibilities are not in themselves enough to demonstrate that [appellant] cannot receive a fair trial") (quoting Marion, 404 U.S. at 326); Benson, 846 F.2d at 1341 (finding no due process violation despite eight year delay, loss of evidence, and death of a witness); Jakisa, 2015 WL 1810259, at *7–13 (finding no due process violation despite a delay of over twenty years, the loss of witness testimony, and the loss of the firearm believed to be used in the murder of the victim).[6]

---

[6] Moreover, the Court notes that Defendant Auginash's conclusorily assertion that a single police report is not enough to counter tainted or lost witness statements falls well short of meeting the Defendants' burden of showing that any "missing testimony . . . is not available through substitute sources." Bartlett, 794 F.2d at 1290. Based on Defendants' assertions there appear to have been multiple witnesses at the scene of the incident and at least one

Therefore, the Court concludes that on the present record, Defendants have failed to meet their burden of showing that actual and substantial prejudice related to the pre-indictment delay in the present case.

As Defendants have failed to establish as a threshold matter any actual and substantial prejudice, it is unnecessary for the Court to address the element of whether the government intentionally delayed the indictment to gain a tactical advantage or to harass Defendants. See, United States v. Sprouts, 282 F.3d 1037, 1041 (8th Cir. 2002) ("If the defendant fails to establish actual prejudice, we need not assess the government's rationale for the delay."); United States v. Benshop, 138 F.3d 1229, 1232 (8th Cir. 1998) (providing that a "defendant's failure on proof on [the] issue [of prejudice] is a sufficient ground on which to deny a motion to dismiss"); United States v. Savage, 863 F.2d 595 (8th Cir. 1988) ("Only where actual prejudice has been established will the court inquire into the reasons for the delay . . . .").

**B.  Sixth Amendment Speedy Trial**

Defendant Auginash also argues that his Sixth Amendment right to a speedy trial was violated by the delay in prosecution. (Def. Auginash Mem., [Docket No. 65], at 16–21). Defendant Auginash argues that because he "was arrested, interviewed by the FBI, and had his cases handed over to the government in 2014, the government's negligence in delaying to indict [Defendant] Auginash for three years violated his Sixth Amendment right to speedy trial." (Id. at 16).

The protection of the speedy trial clause "is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that

---

police report describing the incident, and Defendants do not specifically address why any missing testimony could not be acquired through one or more of these substitute sources. Defendants bear the burden of demonstrating that the missing testimony is not available through other sources, and Defendants, in the present case, has failed to meet that burden. See, Id.

prosecution." <u>United States v. Marion</u>, 404 U.S. 307, 313 (1971). A person is "accused," and the Sixth Amendment speedy trial protection is engaged, by "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." <u>Id.</u> at 320. "[W]hen no indictment is outstanding, only the 'actual restraints imposed by arrest and holding to answer a criminal charge'" engage the speedy trial protection. <u>United States v. Loud Hawk</u>, 474 U.S. 302, 310 (1986) (quoting <u>Marion</u>, 404 U.S. at 320).

In the present case, Defendant Auginash, without the benefit of any legal citation, argues that his speedy trial rights were activated at the time of his arrest by Red Lake police officers and his being interviewed four days later with a federal agent present. (Def. Auginash's Mem., [Docket No. 65], at 2, 16). The Eighth Circuit Court of Appeals, however, has rejected the argument that the speedy trial right in a federal case is activated by the mere arrest of a defendant by the state. <u>See</u>, <u>United States v. Garner</u>, 32 F.3d 1305, 1309 (8th Cir. 1994) (citing <u>United States v. Brown</u>, 605 F.2d 389, 395 (1979)); <u>see also</u>, <u>United States v. Beede</u>, 974 F.2d 948, 950–51 (8th Cir. 1992) (noting that state arrest does not start the thirty-day clock on the Speedy Trial Act for a subsequent federal charge). The Supreme Court of the United States has also acknowledged that being arrested or indicted by one sovereign would not engage the speedy trial right as to a later arrest or indictment by another sovereign. <u>See</u>, <u>United States v. MacDonald</u>, 456 U.S. 1, 10 n. 11 (1982) ("Of course, an arrest or indictment by one sovereign would not cause the speedy trial guarantee to become engaged as to possible subsequent indictment by another sovereign."). Defendant Auginash offers no argument or legal authority that would distinguish a prior arrest by a state from a prior arrest by a tribal government in the present circumstances; both are sovereign entities distinct from the federal government.

Accordingly, Defendant Auginash's Sixth Amendment speedy trial right was not activated until March 7, 2017, upon his formal Indictment by the United States, [Docket No. 1], and not at the time of the underlying initial arrest by Red Lake on June 21, 2014. See, Garner, 32 F.3d at 1309; MacDonald, 456 U.S. at 10 n. 11.[7]

Therefore, the Court recommends that Defendant Auginash's Motion to Dismiss for Prosecutorial Delay, [Docket No. 44], and Defendant Cook's Motion to Dismiss Indictment Due to Pre-Indictment Delay, [Docket No. 35], be **DENIED**.

## III.    DEFENDANT COOK'S MOTION TO SUPPRESS STATEMENTS. [DOCKET NO. 34].

Defendant Cook moves this Court for an order suppressing the statement he made to Sgt. Johnson at the time of the traffic stop on June 21, 2014. (Def. Cook's Mot. to Suppress Statements [Docket No. 34]).

In his Memorandum in Support of his Motion to Suppress, Defendant Cook contends that Sgt. Johnson was required to provide him with a Miranda warning before questioning him, and due to his "extreme intoxication" he did not give a valid (knowing) waiver of his rights prior to the questioning. (Def. Cook's Mem., [Docket No. 60], at 1–3). Therefore, Defendant Cook argues, his statement to Sgt. Johnson should be suppressed. (Id.).

The Government argues that Sgt. Johnson was not required to provide Defendant Cook with a Miranda warning before questioning him under the public safety exception. (Gov't Response, [Docket No. 65], at 4–5). The Government also argues that, even though a Miranda warning was not required, Sgt. Johnson did provide Defendant Cook with a Miranda warning, and Defendant Cook provided a valid waiver of his Miranda rights. (Id. at 5–6).

---

[7] The Court would also note that there is nothing in the record now before it to even suggest that Defendant Auginash has been held in custody without charge by Red Lak or Federal authorities since June of 2014.

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

As noted above, the Government initially argues that Sgt. Johnson was not required to provide Defendant Cook with a Miranda warning before questioning him. Alternatively, the Government contends that even if a warning was required, Sgt. Johnson provided Defendant Cook with a Miranda warning, and Defendant Cook provided a valid waiver of his Miranda rights (Gov't Response, [Docket No. 65], at 4–5). The Government concedes that there is no doubt Defendant Cook was in custody at the time of the questioning, as well as, that Sgt. Johnson's questioning of Defendant Cook constituted interrogation. (See, Id. at 5).

The Court discusses each of these arguments in turn.

### 1. Officer Safety Exception

"In <u>New York v. Quarles</u>, 467 U.S. 649 (1984), the United States Supreme Court established an exception to the <u>Miranda</u> advisory requirement when 'police officers ask questions reasonably prompted by a concern for public safety.'" <u>United States v. Molina-Tepozteco</u>, No. 7-cr-181 (PLS/SRN), 2007 WL 3023292, at *4 (D. Minn. Oct. 12, 2007) (quoting <u>Quarles</u>, 467 U.S. at 656). "In this context, the protection of the public safety includes protection of the police officers themselves. The exception does not depend upon the subjective motivation of the questioning officers." <u>United States v. Liddell</u>, 517 F.3d 1007, 1009 (8th Cir. 2008) (citation omitted). The Eighth Circuit has "recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search." <u>Id.</u> at 1009–10.

In the present case, Sgt. Johnson asked Defendant Cook "who" had previously been shooting at a house as had been reported to Sgt. Johnson in a telephone call. (May 1, 2017, Motions Hearing, Digital Recording at 1:59–2:01 p.m.). Defendant Cook responded "we both were." (<u>Id.</u>). Sgt. Johnson did <u>not</u> ask Defendant Cook about any possible weapon in the Defendants' SUV nor any other question besides who had previously been shooting at the residence as had been reported.

On the present record, the Government has failed to show how asking a question regarding the identities of participants in a previous shooting is related to public safety at the site of a separate traffic stop when that prior shooting had ended and the suspects of that prior shooting were in police custody. The Government fails to assert a connection between the

question asked by Sgt. Johnson and the public's safety other than merely generically and reflexively noting that the risk of an officer "being injured or killed by a firearm is obvious." (Gov't Response, [Docket No. 65], at 5). However, Sgt. Johnson, did **not** ask Defendant Cook about any firearm in the Defendants' SUV; instead, Sgt. Johnson asked Defendant Cook "who" had participated in the previously reported shooting at the Circle Pines (aka Hooterville) residence. Accordingly, the public safety exception is clearly inapplicable to the questioning and circumstances now at issue in the present case.

Therefore, Sgt. Johnson was required to provide Defendant Cook with a <u>Miranda</u> warning before he undertook to conduct any custodial interrogation of Defendant Cook.

### 2.  Waiver of Rights

Having determined that Sgt. Johnson was required to provide Defendant Cook with a <u>Miranda</u> warning, the Court must next consider whether Defendant Cook waved his rights pursuant to <u>Miranda</u>, as well as, whether that waiver was voluntary, knowing, and intelligent.

It is undisputed that Sgt. Johnson's express questioning of Defendant Cook on June 21, 2014, constituted interrogation. It is also undisputed that Defendant Cook was in custody during the questioning on June 21, 2014, when he made the statement he now seeks to suppress. It is further undisputed, and the record clearly demonstrates, that Defendant Cook was read a <u>Miranda</u> warning before he was asked the question regarding "who" participated in the prior shooting that had been reported to police. Lastly, it is undisputed that, when asked if he understood his rights, Defendant Cook responded "yeah."

Accordingly, the only issue remaining before the Court regarding Defendant Cook's July 21, 2014, statement is whether Defendant Cook's waiver of his rights was made intelligently, knowingly, and voluntarily.

Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's waiver of his rights was made intelligently, knowingly, and voluntarily. Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United

States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant offers no specific argument in his motions papers that the officers engaged in any specific coercive or threatening tactics that caused his will to be overborne. In fact, the Court's independent review of the record indicates that Sgt. Johnson did not engage in any threatening or coercive tactics. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). There is no indication in the record that Sgt. Johnson used anything other than a conversational tone, as well as, no indication in the record that Sgt. Johnson made any threats or promises to Defendant Cook. Further, the questioning, which lasted only moments, was not coercive in its duration. See, Id. (noting that interrogation lasting more than two hours was not coercive in duration).

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant Cook's waiver of his rights on June 21, 2014, was voluntary.

Next, the Court must consider whether Defendant Cook's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. Defendant Cook argues that his waiver was not knowingly and intelligently made because of the extreme level of his intoxication which prevented him from being able to knowingly and intelligently waive his Miranda rights.

The Government, citing United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008), acknowledges that while intoxication is a factor to consider, it does not automatically render a Miranda waiver invalid. (Gov't Response, [Docket No. 65], at 6–7). The Government asserts that the Court in Gaddy found a valid waiver where defendant "appeared awake and coherent even thought he had not slept the previous night and had consumed pain relievers, muscle relaxers, alcohol, marijuana and cocaine in the last 24 hours." (Id. at 7) (citing Gaddy, 532 F.3d at 788). The Government then—apparently arguing that Defendant Cook is similar to the defendant in Gaddy—notes that while Defendant Cook "was unsteady on his feet, . . . had to steady himself on the vehicle," and had slurred speech, he was also "able to pull his shirt up to show he wasn't armed" and "was able to answer Sgt. Johnson's question." (Id. at 7).

A defendant's intoxication, in certain circumstances, can invalidate a waiver of rights pursuant to Miranda; however, the Eighth Circuit has "declined to adopt a per se rule of involuntariness when confronted with intoxication." Makes Room, 49 F.3d at 415. Rather, the Eight Circuit requires an evaluation of whether, in spite of intoxication, "the evidence shows that [the defendant] understood his rights and knowingly waived them." Turner, 157 F.3d at 556.

In Turner, the Eighth Circuit found that although a urinalysis showed the defendant was under the influence of the drug PCP, his behavior at the time of his confession showed he had the mental capacity to waive his rights, including his giving a false name to evade identification, as well as, his ability to later give all his correct identification information, to recall the name and

contact information of the owner of the car he was driving, and to provide officers with a narrative of his actions with his reasons for doing them. Id. The court in Turner relied on the fact that the defendant was cooperative, reviewed and initialed a waiver form, responded to questions, and gave accurate information in finding that he had sufficient mental capacity to waive his rights. Id. The Court also noted that the defendant "acted in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing." Id. at 555.

In United States v. Casal, the defendant had used methamphetamine the evening of his interrogation and had not slept in five days. 915 F.2d 1225, 1227 (8th Cir. 1990). The Court rejected the defendant's argument that his statements were involuntary because of his recent methamphetamine drug use and lack of sleep, finding that there "was evidence that [the defendant] did not act like an intoxicated person" and that the defendant demonstrated an ability to say "no" to the officers when he did not want to speak on a particular subject. Id. at 1229. The Court specifically noted that the testimony established that defendant "did not appear to be intoxicated and talked coherently (indeed, [the defendant] refus[ed] to comply with various police requests)." Id.

In Gaddy, the case relied on now by the Government, the defendant claimed he had not slept the night before his arrest, had taken two or three shots of gin, two pain relievers, 1600 milligrams of muscle relaxers, and had smoked a blunt of mixed marijuana and cocaine. 532 F.3d 783, 786 (8th Cir. 2008). In rejecting the defendant's argument that his confession to law enforcement was involuntary, the Court relied on testimony that the defendant appeared aware and coherent and that he "did not tell them that he was tired, intoxicated or under the influence of drugs," as well as, his extensive contact with law enforcement on prior occasions. Id. at 788–89.

In <u>Contreras</u>, the defendant informed the interviewing police officers, and a separate witness testified at the suppression hearing, that the defendant had "used methamphetamine the night before [his arrest and interview] and had used marijuana the day of [it]." <u>United States v Contreras</u>, 372 F.3d 974, 977 (8th Cir. 2004). In rejecting the defendant's argument that his consent to the search of his home and the statement he made were not voluntary, the Court relied on testimony from the officers that the defendant "appeared to be sober and in control of his faculties at the time he consent[ed]" and on the fact that substantial evidence showed he "was lucid at the time he gave consent and that he understood the questions asked of him." <u>Id.</u> at 977–78.

Each of these cases in which the Eighth Circuit Court of Appeals rejected the argument that a defendant's waiver of his rights was invalid due to his intoxication is materially distinguishable from the factual record in the present case.

For instance, in <u>Turner</u>, the Court specifically relied on the fact that the defendant "acted in a manner consistent with a person attempting to avoid being caught than a person who did not know what he was doing," his behavior during the interview, and his reviewing and initialing a waiver form. <u>Turner</u>, 157 F.3d at 555–56. In the present case, there is no indication that Defendant Cook "acted in a manner consistent with a person attempting to avoid being caught" and no indication that he was able to review anything as had the defendant in <u>Turner</u> who reviewed a waiver form. While the Government points to Defendant Cook's ability to lift his shirt, Sgt. Johnson testified that Defendant Cook had to steady himself on the Defendants' SUV so he did not fall while performing this task. Moreover, the Government fails to articulate how the inordinately simple and isolated task of lifting one's shirt demonstrated the more acute

mental acumen necessary in understanding one's constitutional rights or the consequences of waiving those rights. These differences materially distinguish <u>Turner</u> from the present case.

The present case is also material distinguishable from <u>Casal</u>. In <u>Casal</u>, the Court specifically noted that the defendant "did not act like an intoxicated person," and he demonstrated an ability to say "no" to the officers when he did not want to talk about a particular topic. 915 F.2d at 1227–29. The <u>Casal</u> Court also noted that at least an hour and a half passed between defendant's arrest and his interrogation indicating that some amount of time had elapsed between defendant's use of methamphetamine and his interrogation. In the present case, there is no indication that Defendant Cook demonstrated the ability to say "no" to any question, suggestion, or instruction. There is also a lack of evidence indicating any appreciable gap in time between Defendant's alcohol use and Sgt. Johnson's question to Defendant Cook. The record also makes clear that there is significant evidence that Defendant Cook was acting like a severally intoxicated person; in fact, Sgt. Johnson testified that Defendant Cook had to mostly stabilize himself with a hand on his vehicle; that Sgt. Johnson was concerned for Defendant Cook's safety in walking to the rear of the vehicle even with his hand to stabilize himself because he was essentially "failing down" due to his obvious intoxication; that he allowed Defendant Cook to walk facing forwards rather than backwards as Defendant Auginash had been required to do because of concern for Defendant Cook's safety in walking; and that he had Defendant Cook lay on the ground before making it all the way back to the patrol car again due to concerns for Defendant Cook's safety given his inability to walk without "staggering severely." These differences materially distinguish <u>Casal</u> from the present case.

Likewise, <u>Gaddy</u>, the case upon which the Government relies, is materially distinguishable from the present case. The Court in <u>Gaddy</u> specifically noted that the defendant

appeared awake and coherent, did not tell officers he was under the influence of any substance or intoxicated, and had extensive contact with law enforcement on prior occasions. 532 F.38 at 786–89. Moreover, three hours had passed between the time the defendant in <u>Gaddy</u> last consumed any alcohol or pills and the time he waived his rights pursuant to <u>Miranda</u>. In the present case, the is no dispute that Defendant Cook was intoxicated, and in fact, Sgt. Johnson's testimony as discussed above demonstrates that Defendant Cook was intoxicated at a level where Sgt. Johnson was concerned for Defendant Cook's safety when even attempting to merely walk. As noted above, there is also a lack of evidence indicating any appreciable gap in time between Defendant Cook's alcohol use and Sgt. Johnson's rights warning and inculpatory question to Defendant Cook like the gap in time that had been present in <u>Gaddy</u>.

Similarly, <u>Contreras</u> is also materially distinguishable from the present case. In <u>Contreras</u>, the Court relied on the fact that the defendant "appeared sober and in control of his faculties at the time he consent[ed]" and that substantial evidence showed that he "was lucid at the time he gave consent." 372 F.3d at 978. In the present case, the record is undisputed that Defendant Cook did <u>not</u> appear sober during his interaction with Sgt. Johnson, and there is a lack of evidence, like the evidence in <u>Contreras</u>, showing that Defendant Cook was "lucid" and "in control of his faculties."  The defendant in <u>Contreras</u> responded to questions in an interview style back and forth conversation, reviewed a consent form, and was able to ask for clarification when he had difficulty understanding a "particular English word." <u>Id.</u> at 977–78. In the present case, the evidence fails to demonstrate that Defendant Cook exhibited any such similar ability. While Defendant Cook asked a question regarding what he was being charged with, there is no clear indication that he did so in a manner seeking to clarify a prior statement by Sgt. Johnson, but

instead, the record could equally reflect that due to his severe intoxication, Defendant Cook either did not hear the first statement or did not mentally process that statement.

In the present case, the record clearly demonstrates that Defendant Cook was intoxicated at the time of his purported waiver of his rights pursuant to <u>Miranda</u>, and it further demonstrates that Sgt. Johnson was aware Defendant Cook was intoxicated at that time. While Sgt. Johnson testified that he was able to understand Defendant Cook and that—based on his experience— Defendant Cook appeared able to understand him, Sgt. Johnson also testified that Defendant Cook's speech was "severely slurred." Moreover, Sgt. Johnson testified that he had concerns for Defendant Cook's safety while merely walking due to his "staggering severely" and basically "falling down." Sgt. Johnson also testified that Defendant Cook was much more intoxicated than Defendant Auginash who was himself obviously under the influence of alcohol. Neither the present record nor the Government's arguments provide an explanation to reconcile these discrepancies: Defendant Cook's inability to safely walk even while bracing himself on the vehicle but still able to fully understand the material and substantial magnitude of his right to remain silent and have a lawyer present during questions. Further, the Government has proffered no evidence demonstrating that Defendant Cook had a substantial or lengthy history with law enforcement to demonstrate he knew the intricacies of what was transpiring along the roadside on June 21, 2014.

As already noted, Sgt. Johnson also testified that Defendant Cook was far more intoxicated than Defendant Auginash who blew a 0.176 on a preliminary breath test—twice the legal limit of intoxication. While having a preliminary breath test above the legal limit does not automatically invalidity a <u>Miranda</u> waiver, an officers testimony (based on his experience) that a defendant was far more intoxicated than an individual who was twice the legal limit allows for

27

the reasonable inference that the far more intoxicated defendant may not be able to knowingly and intelligently waive his rights; especially when there is no dispute in the testimony that the more intoxicated defendant was so compromised by his level of intoxication as to be at risk of injury according to the observations of the arresting officer. In the present case, the Government has provided no evidence which would rebut such an inference.

Considering the totality of the circumstances and based on the record presently before the Court, the Court concludes that the Government has failed to show by a preponderance of the evidence that Defendant Cook's waiver of his rights pursuant to <u>Miranda</u> was knowing and intelligent.

Therefore, for the reasons stated above, the Court concludes that Defendant Cook's waiver of his rights on June 21, 2014, was not done knowingly and intelligently.

Based on the foregoing, the Court recommends Defendant Cook's Motion to Suppress Statements, [Docket No. 34], be **GRANTED**.

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant Auginash's Motion to Dismiss for Prosecutorial Delay, [Docket No. 44], be **DENIED**;

2. Defendant Cook's Motion to Suppress Statements, [Docket No. 34], be **GRANTED**; and

3. Defendant Cook's Motion to Dismiss Indictment Due to Pre-Indictment Delay, [Docket No. 35], be **DENIED**.


Dated: June 14, 2017                                    s/Leo I. Brisbois
                                                        Leo I. Brisbois
                                                        U.S. MAGISTRATE JUDGE



### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.